### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| BRANDON MCWASHINGTON, | |
| Plaintiff | |
| v. | Case No. 4:24-cv-_____ |
| JAMES RODGERS, BRIAN G. CURTIS, NOE GARZA, MELISSA A. HINOJOSA, KHALID H. KHALID,  JOSE D. RUIZ, MANUEL A. SALAZAR, WARNER A. SOLIS, and RODOLFO A. TREVINO JR. | **JURY DEMAND** |
| Defendants. | |

## COMPLAINT AND DEMAND FOR  JURY TRIAL

### NATURE OF CASE

1. Plaintiff Brandon Washington is a 37-year-old Black man, father of two, and a lifelong Houston resident. On June 7, 2022, Houston Police Department ("HPD") Officers sicced an out-of-control police dog ("K9") on Mr. McWashington while he sat stationary and unarmed in his car during a routine traffic stop.

2. Mr. McWashington did not attempt to flee from his car, threaten the officers, or actively resist arrest. He was unarmed, non-combative, and struggling to communicate.

3. Rather than approaching Mr. McWashington's car to issue a traffic citation or assess his sobriety, Defendants Solis, Trevino, Hinojosa, Khalid, Curtis, Ruiz, and Salazar pointed lethal weapons—two rifles, at least one of which was an AR-15—at Mr. McWashington while Defendants Solis and Curtis shouted out conflicting commands.

4.  When he failed to comply with Defendants' conflicting commands, Defendant Rodgers threw his K9 onto Mr. McWashington while he sat in his driver's seat.

5.  Mr. McWashington's left forearm and hand have irreparable nerve damage as a result of the K9 attack.

6.  Moments before attacking Mr. McWashington, Defendant Rodgers' K9 bit a fellow HPD officer: Defendant Curtis. The night prior, this same K9 attacked an innocent bystander homeowner while searching in his backyard. In both instances, Defendant Rodgers lost control of his K9 and had not commanded him to bite.

7.  Mr. McWashington is not the first Black man in Houston to have a K9 sicced on him for a non-violent offense. Despite the Black population only comprising 22.4% in Houston,[1] per data obtained from HPD via Public Information Act requests from January 2021 to August 2023, 52% of people that HPD officers have commanded their K9s to attack were Black men. Of these assaults, nearly half (49%) were for non-violent offenses. Moreover, 24.8% of the Black men mauled were not charged with a new criminal offense of any kind.

8.  Even before the proliferation of modern "K-9 units," dogs have long been used to terrorize Black people. Throughout the United States, and especially in the South, dogs were bred and groomed to maul enslaved Black people for running away or otherwise angering their enslavers.[2] Historians have drawn a straight line from this gruesome antebellum practice to the modern use of attack dogs by policing agencies like HPD.[3]

---

[1] United States Census Bureau, *U.S. Census Bureau Quickfacts: Houston City, Texas*, *available at* https://tinyurl.com/26t4ck6j.
[2] Tyler D. Parry & Charlton W. Yingling, *Slavehounds and Abolition in the Americas*, 246 Past & Present 69, 81, 91 (2020), *available at* https://tinyurl.com/bdz3ew2m.
[3] See Larry H. Spruill, *Slave Patrols, "Packs of Negro Dogs" and Policing Black Communities*, 53 Phylon 42 (2016), *available at* https://tinyurl.com/5n6evbm6.

9. Against the backdrop of HPD's disproportionate use of K9s to track and maul Black men, and the long history of dogs being used by law enforcement to control and brutalize Black people, Mr. McWashington brings this civil lawsuit against the Defendants for their excessive, brutal, and dangerous response to a routine traffic stop.

## PARTIES

10. Mr. McWashington is a 37-year-old Black man and a loving parent, son, and grandchild.

11. Mr. McWashington is a lifelong Houston resident.

12. Defendants Brian G. Curtis, Noe Garza, Melissa Amber Hinojosa, Khalid Haitham Khalid, Jose D. Ruiz, James Rodgers, Manuel A. Salazar, Warner A. Solis, and Rodolfo A. Trevino Jr. (collectively, "Defendants") are Houston Police Department ("HPD") officers who acted within the scope of their employment and under the color of law during the events at issue. They are sued in their individual capacities.

## JURISDICTION AND VENUE

13. Mr. McWashington brings this action under the Fourth and Fourteenth Amendments to the United States Constitution, as authorized by the Ku Klux Klan Act, 42 U.S.C. § 1983.

14. The Court has jurisdiction over Mr. McWashington's claims under 28 U.S.C. §§ 1331 (action arising under the Constitution and federal law) and § 1343(a) (action to redress deprivation of civil rights).

15. Venue is proper under 28 U.S.C. § 1391(b) because one or more Defendants reside in this judicial district and all Defendants are residents of Texas, or, alternatively, because the events or omissions giving rise to Mr. McWashington's claims occurred in this district.

## STATEMENT OF FACTS

**A. Defendants responded to a routine DWI traffic stop with excessive and disproportionate force.**

16. At approximately 11:00 PM on June 7, 2022, Defendant Solis initiated a traffic stop of Mr. McWashington for a suspected DWI and for driving without his headlights on.

17. Defendant Solis observed Mr. McWashington's white Buick slowly roll past a stop sign on Foster Street while turning right onto Alice Street in the South Side neighborhood of Houston. Defendant Solis turned on his lights, and, intermittently, his sirens, to signal a stop.

18. Mr. McWashington did not immediately pull over. Defendant Solis called dispatch to report he was engaged in a "slow roll" stop.

19. Mr. McWashington traveled for 0.6 miles total (approximately three minutes' driving) before he stopped his car. At no point did Mr. McWashington drive above the speed limit of 30 miles per hour.



20. After parking, Mr. McWashington opened his car door, attempting to exit the car.

21. Instead of approaching Mr. McWashington's car as he exited the car, Defendant Solis shouted at Mr. McWashington to stay in his car. Mr. McWashington complied and remained in his car.

22. Defendant Solis did not approach Mr. McWashington's car and begin issuance a traffic ticket.

23. Defendant Solis did not approach Mr. McWashington's car to begin an assessment of Mr. McWashington's sobriety.

24. Defendant Solis did not ask Mr. McWashington any investigative questions or request Mr. McWashington's license and registration.

25. Instead, Defendant Solis unholstered his lethal duty weapon and pointed it at Mr. McWashington's driver-side door.

26. Despite initially ordering Mr. McWashington to remain inside his car, Defendant Solis began to shout at Mr. McWashington to throw his keys on the ground and exit the car with his hands in view. Mr. McWashington called back, "I ain't got them," in a slow and audibly slurred voice.

27. At this point, Defendant Solis had no information suggesting that Mr. McWashington was armed.

28. Defendant Solis had no information suggesting that Mr. McWashington was attempting to flee from his car. In fact, Mr. McWashington remained seated in his car after being commanded just moments before to stay put.

29. Instead of conducting a routine traffic stop or asking any investigative questions, approximately 40 seconds later, Defendant Solis reported to dispatch that Mr. McWashington was refusing to exit his car.

30. Defendants Curtis, Garza, Hinojosa, Khalid, and Trevino from HPD's Crime Reduction Unit ("CRU") Gang Division arrived on the scene within approximately two minutes of Mr. McWashington parking. Defendant Salazar arrived four minutes later. They were informed via dispatch that Defendant Solis had initiated a DWI traffic stop against Mr. McWashington and that he had yet to exit his car.

31. Once on the scene, for at least 15 minutes, Defendants Curtis, Garza, Hinojosa, Khalid, Ruiz, Salazar, and Trevino did not witness Mr. McWashington attempt to flee from his car, threaten the officers, or actively resist.

32. HPD officers have a duty to intervene when a fellow officer uses unreasonable force.[4]

33. Despite seeing that Mr. McWashington posed no danger to the officers or the public in any way, Defendants Curtis, Garza, Hinojosa, Khalid, Ruiz, Salazar, and Trevino failed to direct Defendant Solis to re-holster his lethal weapon.

34. Defendants Curtis, Garza, Hinojosa, Khalid, Ruiz, Salazar, and Trevino further failed to approach Mr. McWashington's window to "investigate" his sobriety and failed to "determine if probable cause exist[ed] to make an arrest for DWI," as required by HPD policy.[5]

35. Instead, immediately upon arriving on the scene, Defendants Curtis, Hinojosa, Khalid, Salazar, and Treinvo unholstered their guns and aimed them at Mr. McWashington. Defendant Curtis additionally donned a ballistic tactical shield.

36. Defendant Khalid—in an extraordinary and dangerous escalation—trained an AR-15 automatic rifle at Mr. McWashington's car door.

---

[4] Houston Police Department, *Use of Force General Order (#600-18)*, at 7-8 (issued Mar. 4, 2022), *available at* https://tinyurl.com/3sz9swsu.
[5] Houston Police Department, *Driving While Intoxicated General Order (#500-04)*, at 1 (issued Oct. 3, 2018)*, available at* https://tinyurl.com/3964rd6h.

37. Defendant Solis continued to shout commands at Mr. McWashington to exit his car.

38. While Defendant Solis ordered Mr. McWashington to exit his car, Defendant Curtis directed Mr. McWashington to put his hands "on the steering wheel at least," which, necessarily, would require him to remain in his car.

39. These contradictory commands would have confused any reasonable person as to what to do to avoid imperiling or possibly losing their life.

40. Mr. McWashington remained seated in his car, his driver side door open, with both feet outside of the car, facing outward, giving Defendants a clearer view of his body and movements.

41. Six minutes after Mr. McWashington pulled over, Defendant Solis confirmed that a K9 unit was en route to the scene.

42. During this time, none of the Defendants on the scene initiated a routine traffic stop, began a routine assessment of Mr. McWashington's sobriety, asked any investigative questions, or requested Mr. McWashington's driver's license and registration.

43. Defendant Solis holstered his gun and, instead, trained a soft-impact weapon on Mr. McWashington's person. Defendant Garza affirmed Solis ought to "g[o] first" if they shot—exhibiting Defendants' willingness to use the lethal weapons they had drawn on Mr. McWashington.

44. As he shouted commands, Defendant Solis sounded audibly agitated and upset. Defendant Garza at one point attempted to calm him down, saying: "You're good, you're good. We've got enough guns out here. We've got enough people here."

45. Defendant Salazar also admonished Defendant Solis' heightened response, saying "Hold on, relax, relax."

**B. Defendants were aware Mr. McWashington was intoxicated and potentially uncomprehending, but they failed to de-escalate the arrest or interrogate his sobriety.**

46. Mr. McWashington repeatedly opened and closed his car door, sitting for several minutes with the driver side door open and his feet outside of the door as if bracing himself to stand. He visibly struggled to exit the car.

47. Acknowledging Mr. McWashington may be physically struggling to comply, Defendant Solis repeatedly yelled to Mr. McWashington: "Can you walk?" and "Do you need help to walk?" Defendant Solis turned to other officers to inquire, "Can he walk?"

48. None of the Defendant officers responded by approaching and offering Mr. McWashington help to exit his car, or by conducting a routine sobriety assessment.

49. Defendant Solis shouted instructions on how Mr. McWashington ought to proceed if he could not walk: "Try to work your way out of the vehicle if you can't walk," and, "Grab the frame of the window with two hands and work your way out."

50. Acknowledging Mr. McWashington may be under the influence of an unknown substance and was struggling to comply as a result, Defendant Solis asked his fellow officers, "He's probably on something, huh?"

51. Nonetheless, Defendant Solis still failed to approach Mr. McWashington's car to render aid, see if he was able to walk, or conduct a routine sobriety assessment.

52. Twelve minutes after Mr. McWashington parked his car, he complied with Defendant Solis' commands and slowly lowered himself out of his car and onto the ground with both hands empty.

53. Mr. McWashington appeared dazed and sat with his back facing the Defendants.

54. Defendant Solis asked Mr. McWashington to "drag [himself] towards" them, evincing a belief that Mr. McWashington cannot walk. Defendant Curtis asked: "Can you crawl this way?"

55. Mr. McWashington then lay on the ground with his hands empty and crossed in front of his chest. Defendant Solis told him, "That's perfect, that's perfect," and then conflictingly told him, "Put both hands on the concrete at least."

56. Mr. McWashington remained outside of the car on the ground for approximately one minute. No officer approached him to assess if he needed assistance or to apprehend him.

57. With conflicting commands and no officer approaching him to help or apprehend him, Mr. McWashington eventually slowly sat up, crawled chest first towards his car, then got back into his car.

58. Defendant Solis then asked, "Sir, do you want to give it another try? Let's try again. Come on! Use your body or anything you have to get out of the car."

59. Mr. McWashington sat motionless in his car, facing outward, with both feet outside of the car.

60. Despite voicing their belief that Mr. McWashington may be incapacitated or otherwise physically unable to comply, Defendants failed to approach Mr. McWashington's car to determine if he was indeed intoxicated, debilitated, or in need of assistance.

61. Rather, Defendants continually escalated, as if doing so would increase Mr. McWashington's sobriety or ability to follow their commands.

**C. Defendants sicced a police K9 on Mr. McWashington, a dog who was out of control and had attacked two people without being commanded to within the past 24 hours.**

62. Fourteen minutes into the stop, Defendant Solis commanded Mr. McWashington to open his car door. Mr. McWashington complied and opened the door widely and kept it open.

63. Approximately 17 minutes after Mr. McWashington parked his car, Defendant Rodgers and his K9 "Rico" arrived on the scene.

64. Defendant Garza advised Defendant Rodgers that Mr. McWashington was involved in a "slow chase" and has since "refused to get out of his car," but that he "got out at one point" He further informed Defendant Rodgers that Mr. McWashington "might be intoxicated the way he is acting…real sluggish, real slow."

65. Despite hearing from his colleague that Mr. McWashington "might be intoxicated," Defendant Rodgers did not attempt to initiate a routine sobriety assessment or ask if other Defendants had already initiated one.

66. Defendant Rodgers' K9 Rico began whining and barking frantically nearly immediately, pulling towards the car and standing on his hind legs without being commanded to advance. Mr. McWashington closed his car door.

67. HPD officers have a duty to stop fellow officers from using force "that exceeds that which is reasonable under the circumstances,"[6] such as force that "puts a person at risk of bodily injury and is not immediately necessary to avoid *imminent* bodily injury to a peace officer or other person."[7]

68. Mr. McWashington did nothing to suggest he was a threat, let alone an imminent threat, to the officers surrounding him.

69. Despite the absence of any threat from Mr. McWashington, Defendants failed to advise Defendant Rodgers' not to use his K9 against Mr. McWashington or to put his K9 back in his car.

---

[6] Houston Police Department, *Use of Force General Order (#600-18)*, *supra* note 4.
[7] *Id.* (emphasis added).

70. When Defendant Solis then commanded Mr. McWashington to open his car door, Mr. McWashington complied with Defendant Solis' command by opening his door.

71. Despite Mr. McWashington's compliance, and without warning, Defendant Rodgers let go of his K9's leash.

72. K9 Rico charged forward towards Mr. McWashington's car.

73. Mr. McWashington closed his car door before the K9 reached him.

74. Defendant Rodgers ran towards Mr. McWashington's car without a weapon drawn or protective cover.

75. Defendant Rodgers caught K9 Rico's leash and regained control of him next to Mr. McWashington's driver-side door.

76. Defendant Rodgers quickly re-opened Mr. McWashington's door. Defendant Solis pointed a soft-impact weapon at Mr. McWashington, who abruptly closed his car door.

77. Defendants Trevino and Ruiz kept their weapons trained on Mr. McWashington, while Defendants Hinojosa and Khalid pointed their weapons into the passenger-side of the car.

78. Defendant Solis reopened Mr. McWashington's door, without any form of protective cover, and again, pointed his weapon at Mr. McWashington. Mr. McWashington closed his door.

79. Defendant Rodgers backed away from Mr. McWashington's car and, while doing so, his K9 bit Defendant Curtis, latching onto his bicep.

80. Defendant Curtis screamed, moved K9 Rico off of him and spun away from further bites.

81. Despite witnessing K9 Rico's loss of control just moments ago, Defendant Trevino yelled out: "Let the dog, let the dog."

82. With Defendant Curtis' blood still potentially in K9 Rico's mouth, Defendant Rodgers opened Mr. McWashington's car door and threw Rico onto Mr. McWashington.

83. As Mr. McWashington sat still, Defendant Rodgers' K9 immediately sank his teeth into Mr. McWashington's left forearm and began to shake his forearm vigorously back and forth in his jaw.

84. Defendant Rodgers yelled at Mr. McWashington to "come out now" while Rico continued to bite into Mr. McWashington's flesh.

85. Mr. McWashington did not fight back, respond, or even cry out in pain. He continued to sit in his car.

86. Defendant Rodgers pulled Mr. McWashington out of the car and onto the ground while K9 Rico continued to shake Mr. McWashington's forearm between his teeth. Mr. McWashington remained fully compliant as K9 Rico continued to thrash on his arm.

87. Defendant Rodgers regained control of Rico's harness but did not remove his jaws from Mr. McWashington's arm.

88. Defendants Solis, Garza, Hinojosa, Khalid, Ruiz, Salazar, and Trevino watched Defendant Rodgers' K9 maul Mr. McWashington while he lay face down, motionless and unresponsive. They did not direct Defendant Rodgers to remove his K9's jaws from Mr. McWashington's arm.

89. As K9 Rico continued to thrash and tear into Mr. McWashington's arm, Defendants Garza, Hinojosa and Ruiz seized and handcuffed Mr. McWashington's right arm.

90. Defendant Rodgers waited for the other officers to grab ahold of Mr. McWashington's right hand and put it behind his back. K9 Rico continued to shake Mr. McWashington's forearm in his jaw.

91. Defendant Rodgers commanded his K9 to stop biting Mr. McWashington's flesh three times. K9 Rico did not respond and continued to bite into Mr. McWashington's arm.

92. Defendant Rodgers commanded a fourth time, and K9 Rico finally dropped his arm.

93. Defendant Hinojosa forced Mr. McWashington's lacerated left arm behind his back and handcuffed him.

94. Defendants Hinojosa, Salazar, and Solis immediately applied a tourniquet to Mr. McWashington's arm above the elbow to prevent him (in Defendant Solis' words) from "bleeding out." Defendant Salazar praised the severity of the bite, stating, "It's a good dog bite."

95. Mr. McWashington remained on the ground handcuffed behind his back. He struggled to sit upright, often tipping over from sitting to lying down on his wounded left side.

96. Other officers wrapped and bandaged Defendant Curtis' dog bite wounds. Defendant Curtis reported being unable to feel his arm and was later driven to Houston Methodist Hospital for emergency care.

**D. Defendants joked and bragged about siccing a dog on an unarmed and compliant Black man while debriefing his arrest.**

97. Defendant Garza gave Defendant Solis permission to charge Mr. McWashington with evading arrest in a vehicle, stating "go for evading because he got bit."

98. When Defendant Solis asked if he could bring a "resisting" charge against Mr. McWashington as well, Defendant Garza gritted his teeth and shook his head "no."

99. After the bite, the Defendants traded jokes about the dog attack and Mr. McWashington's incapacitation.

100.    Defendant Trevino reported: "I don't think he could've even got out of the car. He opened the door, and he threw himself out and struggled to get back in."

101.    Despite observing that Mr. McWashington was likely unable to get out of his car, Defendant Trevino failed to intervene and de-escalate his fellow officers or check on Mr. McWashington's well-being.

102.    Defendant Solis stated: "The guy wasn't screaming, he was just like… (Defendant Solis flailed his arm out in front of him mimicking Mr. McWashington being mauled by K9 Rico while he lay unresponsive). He concluded, "Oh, he's high as a kite!"

103.    Defendant Hinojosa joked and emphasized Mr. McWashington's passiveness and compliance, eliciting laughter from the officers around her: "That guy didn't scream *at all*. That dog was ripping at his arm and he didn't say a *thing*."

104.    Defendant Trevino confirmed when speaking to the ambulance worker: "This is probably the worst one I've ever seen. I've seen puncture wounds. I've never seen it like this."

105.    Defendant Curtis told Defendant Rodgers he has "gotta train" Rico, who he described as "freaking out" during Mr. McWashington's arrest.

106.    In response, Defendant Rodgers argued his dog is "trained." He suggested it was well known that HPD K9s bite without command and are unpredictable weapons for suspects and officers alike, stating that he's been bitten "plenty of times," including by his own dog.

107.    Sergeant Bickel–Defendant Rodgers' K9 supervisor–affirmed the dangerousness of using K9s, explaining that when his own K9 attacked him, the dog got "both hands and two arms." Defendant Curtis joked: "Did he go to the farm?"

108.    Defendant Rodgers shared that his K9 not only bites fellow officers without command but, just the night prior, had attacked a homeowner while searching in his backyard.

109.    Despite it being a "bad week" for Defendant Rodgers and his K9, Defendant Rodgers chose to use his unpredictable and out-of-control K9 against Mr. McWashington, causing him irreparable injury and harm.

**E. Defendants' excessive use of force caused lasting physical injuries and harm.**

110.    The K9 bites on Mr. McWashington's forearm left "jagged" lacerations six to eight centimeters deep, so deep they exposed muscle and tendons.



Dorsal left proximal forearm laceration:



Laceration to ulnar aspect of proximal forearm, most proximal is at right of picture:

111.   After the K9 attack, Mr. McWashington was transported to Ben Taub Hospital and release from police custody.

112.   Mr. McWashington received emergency orthopedic surgery on June 8 for possible nerve, artery, and tendon repair. He was given sutures for his wounds and kept in the hospital for 48 hours for post-operative care.

113.   The hospital assessed that Mr. McWashington may not be cleared to work without restrictions for two months' time.

114.   Mr. McWashington was forced to stop working as a security guard while his wounds healed after the attack.

16

115.   Mr. McWashington's forearm and hand have permanent nerve damage as a result of the dog bite that doctors have told him cannot be repaired.

116.   Every three days or so, his left arm and hand become numb and lose feeling.

117.   Prior to this incident, Mr. McWashington felt comfortable around dogs. Now Mr. McWashington does not wish to be around dogs, fearing they will bite him.

118.   Mr. McWashington pleaded guilty to evading arrest on June 26, 2023, and was sentenced to two years in prison.

**HISTORICAL RACIALIZED VIOLENCE OF POLICE DOGS**

119.   The use of dogs in policing evolved directly from the state-sanctioned dog attacks of slave patrols. Bloodhounds became so closely associated with slavery that the Fugitive Slave Act of 1850–requiring enslaved people be returned to their enslavers and allowing slave patrol to seize enslaved people in free states using dogs–became known as the "Bloodhound Bill."[8]

120.   Police and white supremacists began using dogs to track and menace Black people fleeing lynchings shortly after slavery was abolished.[9] This practice became even more widespread during the Black-led civil rights movement of the 1960s. Perhaps the most searing incident of police dog violence in recent memory was when police sicced dogs on

---

[8] Madalyn Wasilczuk, *The Racialized Violence of Police Canine Force*, Geo. L.J., Vol. 111:1125, 1136 (2023), *available at* https://tinyurl.com/uhw4cjzx.

[9] *Id.* at 1139. ("Northern policing's adoption of the techniques of European militaries and police implicitly meant the incorporation of techniques honed while enforcing colonial power and subjugating enslaved and conquered peoples in the Americas and across the Global South. The technology of military and slave dogs that evolved into canine policing is inseparable from the transatlantic racial colonial project. As such, Northern canine policing grew from the EuroAmerican, racialized imperial-colonial project and implemented that project as white fears of racialized immigrants and Black 'others' grew across the urbanizing North.").

Black children marching for civil rights, generating the "iconic images of German shepherds attacking students" appearing in newspapers across the country.[10]

121.    Mr. McWashington, like many Black men in the South, is particularly vulnerable to the state's violent use of police dogs to control Black people's movement.

122.    When defendant Rodgers directed K9 Rico to attack Mr. McWashington, Mr. McWashington became one of the 52% of HPD's Black dog bite victims.

**CLAIMS FOR RELIEF**

**COUNT I: Defendant Rodgers Violated Mr. McWashington's Fourth Amendment Right to Be Free of Excessive and Unreasonable Force by Unjustifiably Siccing his Police K9 on Mr. McWashington.**

123.    Mr. McWashington asserts this count under the Ku Klux Klan Act, 42 U.S.C. § 1983, against Defendant Rodgers, and incorporates by reference all preceding allegations as if fully set forth herein.

124.    Defendant Rodgers violated Mr. McWashington's Fourth Amendment right to be free from excessive force, as incorporated to the states through the Fourteenth Amendment, by siccing a known-to-be-unpredictable and uncontrollable police attack dog on him, allowing the dog to maul him for nearly 30 seconds, tear apart his left forearm, ripping tendons, muscle and flesh down to the bone, and inflicting some of the worst dog bite

---

[10] Wasilczuk, *The Racialized Violence of Police Canine Force*, *supra* note 8, at 1141-42. An "'upsurge of police dog teams' coincided with the nation's racial upheaval in the 1960s. Three hundred-fifty programs were implemented during the 1960s, followed by a surge of discontinuances in 1965 on the heels of the brutal use of dogs against civil rights and anti-war protestors." Police used dogs to attack "a minister leading a voter registration drive" in Greenwood Mississippi in 1963, as well as to attack Black civil rights protestors in "Petersburg and Danville, Virginia; Jackson, Mississippi; and Chicago, Illinois." In one particularly horrific case in Wichita, Kansas in 1961, "police set dogs upon a crowd that congregated in the streets during a youth dance at the YWCA and then sent the dogs inside. Young people were bitten, and others jumped through the windows of the building to escape." *Id.*

wounds even Defendants had ever seen, without any reasonable basis to believe this level of force was warranted.

125.    Accused of slow rolling through stop signs and not immediately pulling over, Mr. McWashington was only suspected of a non-violent traffic offense when he was stopped.

126.    Mr. McWashington made no threats towards the officers, made no attempt to flee from his car, was visibly unarmed, and did not actively resist the Defendants. Any resistance that Mr. McWashington exhibited was passive at most.

127.    Defendants Garza, Hinojosa, Solis, and Trevino stated multiple times that they believed Mr. McWashington was physically and/or mentally impaired and/or was under the influence of an unknown substance.

128.    Defendants Curtis and Solis gave Mr. McWashington conflicting orders, sometimes telling him to stay in the car, and sometimes telling him to exit the car.

129.    Despite the fact that Mr. McWashington was only suspected of a non-violent offense and did not threaten the officers, attempt to flee from his car, or offer any physical resistance, Defendants requested a police K9 on the scene. Defendant Rodgers sicced his police K9 attack dog on Mr. McWashington, allowing the dog to drag, thrash, and tear into Mr. McWashington's flesh.

130.    Mr. McWashington was still fully compliant and did not physically resist the dog's excruciating initial bite, yet Defendant Rodgers let his dog continue to tear into Mr. McWashington's arm for approximately 30 more seconds. Mr. McWashington was so still that even Defendants commented on his complete lack of resistance or reaction to the dog attack.

131.   Defendant Rodgers violated Mr. McWashington's Fourth Amendment right to be free from excessive force by allowing the dog to continue biting, thrashing and tearing Mr. McWashington's arm for approximately 30 seconds as he remained nonresistant, passive and still.

132.   Defendant Rodger's actions were objectively unreasonable in light of the circumstances he confronted.

**COUNT II: Defendant Solis Violated Mr. McWashington's Fourth Amendment Right to Be Free of Excessive and Unreasonable Force by Quickly and Unjustifiably Unholstering and Pointing his Lethal Duty Weapon at Mr. McWashington.**

133.   Mr. McWashington asserts this count under the Ku Klux Klan Act, 42 U.S.C. § 1983, against Defendant Solis, and incorporates by reference all preceding allegations as if fully set forth herein.

134.   Defendant Solis violated Mr. McWashington's Fourth Amendment right to be free from excessive force, as incorporated to the states through the Fourteenth Amendment, by quickly unholstering his lethal duty weapon on Mr. McWashington during a traffic stop with no reasonable basis to believe this level of force was warranted.

135.   Defendant Solis pulled Mr. McWashington over for slow rolling through stop signs, a nonviolent traffic offense.

136.   Once pulled over, at no point did Defendant Solis approach Mr. McWashington's car to assess his sobriety, ask investigative questions or ask for his license and registration.

137.   Mr. McWashington made no threats towards the officers, made no attempt to flee from his car, was visibly unarmed, and did not actively resist Defendant Solis.

138.    Despite this, Defendant Solis ordered Mr. McWashington to remain in his car, then reported to dispatch and backup that Mr. McWashington was refusing to exit his car. Mr. McWashington's resistance was passive at most, not active.

139.    Instead of approaching Mr. McWashington's car to speak to him further when Mr. McWasington posed no threat or flight risk, Defendant Solis resorted to brandishing his lethal duty weapon and training it at Mr. McWashington.

140.    Defendant Solis's actions were objectively unreasonable in light of the circumstances he confronted.

**COUNT III: Defendants Garza, Hinojosa, Khalid, Ruiz, Salazar, Solis and Trevino Violated Mr. McWashington's Fourth Amendment Right to Be Free of Excessive Force by Failing to Intervene or Protect Him From an Unjustifiable K9 Attack.**

141.    Mr. McWashington asserts this count under the Ku Klux Klan Act, 42 U.S.C. § 1983, against Defendants, Garza, Hinojosa, Khalid, Ruiz, Salazar, Solis and Trevino ("Bystander Defendants") and incorporates by reference all preceding allegations as if fully set forth herein.

142.    For the at least 15 minutes they were on the scene prior to the dog attack, none of the Bystander Defendants witnessed Mr. McWashington attempt to flee from his car, threaten the officers or actively resist.

143.    For the at least 15 minutes they were on the scene prior to the dog attack, none of the Bystander Defendants asked any investigative questions, attempted to conduct a routine traffic stop, or attempted to conduct a routine sobriety assessment.

144.    Bystander Defendants were present on the scene and had approximately 13 minutes' notice that a police dog was arriving, but refused to take reasonable measures to intervene before or during Mr. McWashington's mauling by the police dog.

145.    They failed to intervene despite personally witnessing and commenting on the fact that Mr. McWashington was likely under the influence of an unknown substance and likely could not exit the car on his own.

146.    Bystander Defendants Solis and Hinojosa even commented on how Mr. McWashington offered no resistance as the dog mauled him, yet failed to intervene as the dog mutilated his arm for 30 seconds.

147.    By failing to protect Mr. McWashington from Defendant Rodgers' unconstitutionally excessive use of force of the police K9 Rico's mauling, despite being physically present, aware of Defendant Rodgers' constitutional violations, and having ample opportunity to intervene, Bystander Defendants violated Mr. McWashington's right to be free from unconstitutionally excessive force.

148.    Bystander Defendants not only failed to intervene but acquiesced in and ratified Defendant Rodgers' excessive use of force via his police K9 before, during, and after Mr. McWashington's mauling by the police dog by, *inter alia*, standing steps away and watching while Defendant Rodgers' unnecessarily escalated the scene and prolonged the attack.

**COUNT IV: Defendants Curtis, Hinojosa, Khalid, Ruiz, Salazar, and Trevino Violated Mr. McWashington's Fourth Amendment Right to be Free of Excessive Force By Unjustifiably Pointing Their Lethal Duty Weapons at Mr. McWashington.**

149.    Mr. McWashington asserts this count under the Ku Klux Klan Act, 42 U.S.C. § 1983, against Defendants Curtis, Hinojosa, Khalid, Ruiz, Salazar, and Trevino and incorporates by reference all preceding allegations as if fully set forth herein.

150.    Defendants violated Mr. McWashington's Fourth Amendment right to be free from excessive force, as incorporated to the states through the Fourteenth Amendment, by

quickly unholstering their lethal duty weapons on Mr. McWashington during a traffic stop without a reasonable basis to believe this level of force was warranted.

151.    Defendants were aware Mr. McWashington was stopped for slowly rolling through a few stop signs, a nonviolent traffic offense.

152.    For the at least 15 minutes they were on the scene prior to the dog attack, none of the Defendants witnessed Mr. McWashington attempt to flee from his car, threaten the officers or actively resist. Mr. McWashington was also visibly unarmed.

153.    Defendants Garza, Solis and Trevino stated multiple times that they believed Mr. McWashington was physically and/or mentally impaired or was under the influence of an unknown substance.

154.    At no time did any of the Defendants approach Mr. McWashington's car to assess his sobriety, ask investigative questions or for his license and registration.

155.    Rather than approaching Mr. McWashington, seizing him when he lay on the ground or continuing verbal negotiations, Defendants escalated the encounter when he was suspected of a nonviolent traffic offense, was non-threatening, and at best passively-resisting and posing no risk of escape.

156.    Defendants' actions were objectively unreasonable in light of the circumstances they confronted.

### REQUEST FOR RELIEF

157.    Defendants' violence and utter disregard for Mr. McWashington's basic human dignity and constitutional rights have left Mr. McWashington with agonizing pain, fear, ongoing physical and emotional injuries, nerve damage, mental trauma, and material

costs. Mr. McWashington now asks this Court to enter judgment confirming Defendants are not above the laws they enforce and holding Defendants accountable.

158.    WHEREFORE, on the basis of the foregoing, Plaintiff demands a jury trial for all issues triable pursuant to the Seventh Amendment of the United States Constitution and Federal Rules of Civil Procedure, and requests that this Court issue the following relief:

    a.    Declare that Defendants violated Mr. McWashington's constitutional rights;

    b.    Award compensatory damages against Defendants in an amount to be determined by a jury at trial;

    c.    Award punitive damages against Defendants for their willful and egregious violations of the law in an amount to be determined by a jury at trial;

    d.    Award reasonable attorneys' fees, expenses and costs of litigation pursuant to 42 U.S.C. § 1988 and other applicable law;

    e.    Award such relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


Respectfully submitted this 6th day of June, 2024,


_____
Nii Amaa Ollennu (Texas Bar No. 24098205; S.D. Tex. Bar No.3884094)*
Nii@naolawfirm.com
NO Law Firm, PLLC
1216 N. Central Expy, Suite 208
McKinney, TX 75070
Telephone: (469) 620-0333


Bina Ahmad (*pro hac vice* forthcoming)**

bina@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, DC 20009
Telephone: (202) 844-4975

Brittany Francis (*pro hac vice* forthcoming)†
brittany@civilrightscorps.org
Civil Rights Corps
1601 Connecticut Ave. NW, Suite 800
Washington, D.C. 20009
Telephone: (202) 844-4975

\* Attorney-in-Charge.

\*\* Admitted to practice in New York (Bar No. 4419180), California (Bar No. 329387) and the District of Columbia (Bar No. 502839).

† Admitted to practice in New York (Bar No. 5337555) and the District of Columbia (Bar. No. 90008960.).